IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DALE C FRANKHOUSER,<br>　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>THE HORST GROUP, INC.,<br>　　　　　　　Defendant. | :<br>:<br>:<br>: 　Civil No. 5:20-cv-03741-JMG<br>:<br>:<br>: |

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                                                           **February 24, 2022**

Plaintiff Dale Frankhouser claims that Defendant The Horst Group, Inc. ("Horst") terminated his employment in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.* Horst now moves for summary judgment on both of Frankhouser's discrimination claims. Genuine issues of material fact remain, so the Court denies the motion.

**I.      FACTUAL BACKGROUND[1]**

　　**A.      Frankhouser's Position**

Frankhouser was born in 1950 and began his employment at Horst in 1978 as a bookkeeper. (Def.'s Statement of Undisputed Facts ¶ 11, ECF No. 35 [hereinafter "DSOF"]; Pl.'s Responsive Statement of Facts ¶ 11, ECF No. 36 [hereinafter "PRSOF"].) Frankhouser later became an Information Technology ("IT") manager, the position that he held until his termination in 2019. (DSOF ¶¶ 13, 133; PRSOF ¶ 13.) As an IT manager, Frankhouser's duties included ensuring that

---

[1]   The parties filed a Joint Appendix of exhibits. *See* ECF No. 35-1. The Court references the materials included in the Joint Appendix as "Appx." Frankhouser also filed a separate appendix of exhibits. *See* ECF Nos. 36-1, 37-4. The Court references those materials as "P.A."

Horst's IT system "was stable, operating, [and] available . . . on demand." (DSOF ¶ 15; PRSOF ¶ 15.) He was also responsible for safeguarding the "security of all of [Horst's] data." (DSOF ¶ 15; PRSOF ¶ 15.)

Michael Giordano, Horst's Chief Financial Officer, started supervising Frankhouser in 2015. (DSOF ¶¶ 20, 22; PRSOF ¶¶ 20, 22.) As Frankhouser's direct supervisor, Giordano was the ultimate decisionmaker concerning Frankhouser's employment. (DSOF ¶ 24; PRSOF ¶ 24.)

### B.   Frankhouser's Performance

Sometime before 2018, several Horst stakeholders started complaining to Giordano about Frankhouser's performance. (DSOF ¶ 25; PRSOF ¶ 25.) For example, Jim Burnham, one of Horst's Presidents, informed Giordano of his "frustrations with [Frankhouser's] leadership and poor communication and concerns regarding cybersecurity, WiFi support, [and] 24/7 support." (Appx. 140.) Frankhouser's performance was also measured against reports generated by two third-party IT consulting groups. The first report was issued in 2017, when Frankhouser retained Weidenhammer Services Corp. ("Weidenhammer") to assess Horst's network security. (DSOF ¶ 42; PRSOF ¶ 42.) Weidenhammer's report identified several security threats to Horst's IT system. (DSOF ¶ 43; PRSOF ¶ 43.) Frankhouser directed his subordinate, Tim Barker, to remediate the shortcomings identified in the Weidenhammer report. (DSOF ¶ 44; PRSOF ¶ 44; Appx. 56–57.) Frankhouser did not independently verify whether Barker addressed "all items in [the Weidenhammer] report." (Appx. 57, 60.) Nor did he present the Weidenhammer report to Giordano or the Key Leadership Team ("KLT")—a consortium of Horst's Presidents and managers. (*See* Appx. 55, 87.)

In January 2018, the KLT convened to evaluate Horst's various departments. (DSOF ¶¶ 8, 50; PRSOF ¶¶ 8, 50.) To that end, the KLT produced a Strength, Weaknesses, Opportunities,

and Threats report ("SWOT Report"). It identified the following as among the "weaknesses" of the IT department: "No backup for [Frankhouser]"; "Lack of depth of leadership – succession planning"; "Lack of frequent communication with KLT – no formal IT strategy to . . . build a strong competitive advantage." (Appx. 167.) It identified the following as among the "threats" to the IT department: "Security Breaches" and "System integrity and breach – much could be happening to protect our system but you hear virtually nothing from IS management about that." (*Id.*)

Giordano presented the SWOT Report to Frankhouser during a February 2018 meeting. (DSOF ¶ 55; PRSOF ¶ 55.) The parties dispute what happened during that meeting: according to Horst, Giordano warned Frankhouser that "this is not good." (Appx. 72.) Giordano further testified that he instructed Frankhouser to develop "a strategic plan to . . . move the department forward" that would be presented at the next KLT meeting in April 2018. (Appx. 72–73.) Frankhouser, on the other hand, maintains that "[n]othing was ever told to [him] about any performance issues." (*See* P.A. 28–29; *see also* Appx. 257 ("I did not have any conversations with Michael Giordano regarding my job performance. In fact, he did not have a yearly performance review with me for the last two years of my employment at Horst Group.").) Frankhouser also believed that he was invited to the April 2018 KLT meeting just to discuss the installation of new phone systems—not to discuss the SWOT Report. (*See* PRSOF ¶ 59.) As such, he did not prepare a formal response to the SWOT Report in advance of the April 2018 KLT meeting. (*See* Appx. 65; *see also* PRSOF ¶ 61.)

Frankhouser attended the April 2018 KLT meeting and "there was a discussion regarding the SWOT [Report]." (Appx. 257.) According to several attendees, Frankhouser accused the KLT of "not keeping him in the loop." (Appx. 73; *see also* Appx. 93 ("[Frankhouser] basically told the

3

KLT they were the problem with IT."); Appx. 114 ("[Frankhouser's] only presentation to the [KLT] in that meeting was that he didn't think any of the problems identified were his own, and that he thought they were the problem of the [KLT]."); DSOF ¶ 64.)  Frankhouser's behavior was so disappointing in the eyes of the KLT that one of its members considered terminating him immediately thereafter.  (*See* Appx. 79–80, 83.)  While Frankhouser "did communicate [his] frustration with the lack of communication coming from members of the KLT," he maintains that he was not "directly accusatory" during the meeting.  (P.A. 274.)  He also notes that the KLT asked about his "succession plan" at the meeting.  (*See* P.A. 12; Appx. 254 ("The KLT asked about my succession plans in April 2018.  The meeting was supposed to be about a new phone system but turned out to actually be a SWOT . . . meeting about my department.").)

After the April 2018 meeting, Giordano did not observe any improvements in communication from Frankhouser.  (DSOF ¶ 66.)  Frankhouser, by contrast, states that he "received no further communication as to what was expected of [him]."  (P.A. 274.)

On May 30, 2018, Rick Watson, a member of the KLT, emailed Giordano stating that "[w]aiting for Dale isn't getting us anywhere fast enough.  We need to discuss an executive level plan that you present to the KLT outlining what you see as the steps and actions we need to take to where we need it to be."  (P.A. 201.)  The following month, Giordano started developing a plan to terminate Frankhouser.  (*See* DSOF ¶ 68; PRSOF ¶ 68.)  Giordano memorialized that plan in a document that was presented to the KLT.  The document, titled "Change to IT department leadership," identified the following as among the reasons for terminating Frankhouser: "Lack of confidence to move the company forward in regards to IT"; "Lack of communication between IT department and KLT"; "Lack of communication between department itself"; and "Appearance of retired in place."  (P.A. 208.)  It also provided a timeline for Frankhouser's termination: interviews

4

for his replacement would occur in July 2018, and the "[n]ew person [would be] in place" the following month. (P.A. 208.)

But before Giordano executed that plan, Horst decided to hire Arraya Solutions ("Arraya"), a third-party consultant, to audit the company's IT system. (*See* DSOF ¶¶ 69–70; PRSOF ¶¶ 69–70; P.A. 46 ("[W]e decided that we should be looking for a third-party consultant to come in and just kind of take a look at the department as a whole.").) Watson testified that Arraya was retained, at least in part, to bolster the search for Frankhouser's replacement. (*See* P.A. 127 ("Generally I believe there was a discussion . . . but in order to do a search for [a] replacement, we ought to have a better understanding of our environment.").) And Frankhouser emphasizes that the KLT continued to contemplate his termination even as Arraya performed its audits.[2] For example, in a July 17, 2018 email, Giordano wonders whether Arraya offers a recruiting "service or if we need to go to someone else." (P.A. 165.) An October 30, 2018 email circulated among the KLT reiterates that "we should proceed with the leadership transition (DF) plan discussed during our last KLT." (P.A. 69–70.) Likewise, on November 2, 2018, Giordano emailed Arraya to ask for "a sample job description of the person [Arraya] would recommend to lead [Horst's] IT department." (P.A. 183.) Sometime that month, Giordano asked Mary Geist, a human resources employee, "to pull together a severance letter for [Frankhouser]." (P.A. 88.)

Arraya ultimately issued three reports: (1) a Wireless Local Area Network ("WLAN") site survey on October 22, 2018; (2) an overall Network Assessment in November 2018; and (3) a Vulnerability Assessment report on January 9, 2019 (collectively, "Arraya Reports"). (DSOF ¶

---

[2] Horst does not deny that "there were discussions concerning . . . termination . . . *prior to and during the time* Arraya was completing its assessment." (DSOF ¶ 134 (emphasis added).) But it stresses that "Giordano did not make the decision to terminate [Frankhouser's] employment until *after* the Arraya Reports confirmed . . . numerous significant IT issues and serious security threats." (*Id.* (emphasis added).)

5

74; PRSOF ¶ 74; Appx. 282, 304–05, 346.) In sum, the Arraya Reports "assessed the technical strengths and limitations of [Horst's] IT systems and opined as to whether [they] met best practices." (DSOF ¶ 75; PRSOF ¶ 75.) The WLAN report made "recommendations for how the wireless network should be designed to meet today's requirements." (Appx. 306.) The Network Assessment report "identified overall systems issues for [Horst's] Local Area Networks (LAN), Wide Area Networks (WAN) and Virtual Private Area Networks (VPN)." (DSOF ¶ 78; PRSOF ¶ 78.) Finally, the Vulnerability Assessment report identified "cyber security vulnerabilities that may exist across [Horst's] enterprise network." (Appx. 284.) It found a handful of external and internal vulnerabilities, ranging from "urgent" to "minimal," in Horst's network. (*See* Appx. 287, 292.) Frankhouser admits that Horst faced "significant IT security threats" in both 2019, when the final Arraya Report was issued, and in 2017, when the Weidenhammer report was issued. (PRSOF ¶ 91.) He also admits that he "did not address many of the issues outlined in the Weidenhammer report . . . and, as a result, some of these same issues were contained in the Arraya Reports." (DSOF ¶ 108; PRSOF ¶ 110.)

### C. Frankhouser's Termination

Horst terminated Frankhouser in February 2019. (*See* Appx. 40.) According to Horst, the Arraya Reports "confirmed the deficiencies with [Frankhouser's] job performance" (Appx. 126), which prompted the final decision to terminate Frankhouser. (Appx. 83; *see also* Appx. 119–20 ("[M]y understanding is that [Frankhouser] was terminated for performance reasons relating to issues identified in the Arraya report as well as in general a lack of confidence or concerns expressed by KLT members in various KLT open discussions.").) As Frankhouser recalled at his deposition, Giordano informed him that Horst "wanted to go to a change of direction" and that the termination "wasn't performance related." (P.A. 28.) Geist similarly testified that Frankhouser

"wasn't let go for performance issues." (P.A. 98.) Frankhouser's replacement, Dustin Ebelhar, "started at Horst on April 29th, 2019." (Appx. 190–91.)

### D.     Procedural History

On June 20, 2019, Frankhouser dual-filed a complaint against Horst with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Rights Commission ("PHRC"). (Compl. ¶ 14, ECF No. 1.) On July 31, 2020, Frankhouser filed his Complaint, alleging claims of age discrimination under the ADEA and the PHRA. (*Id.* ¶¶ 49–55.) Horst filed an Answer on September 30, 2020. (Answer, ECF No. 5.) Horst filed the instant Motion for Summary Judgment on January 4, 2022. (Def.'s Mot., ECF No. 33.) Frankhouser filed a Response in Opposition to the Motion on January 25, 2022. (Pl.'s Resp., ECF No. 37.) Both parties submitted supplemental briefing thereafter. (Def.'s Reply, ECF No. 41; Pl.'s Sur-Reply, ECF No. 45.)

## II.    STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are material if they "might affect the outcome of the suit under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute as to those facts is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson*, 477 U.S. at 248). "We view all the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Id.* (internal quotation marks and citation omitted).

The party moving for summary judgment must first "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

7

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

### III. DISCUSSION

For the reasons set forth below, the Court denies Horst's Motion for Summary Judgment on Frankhouser's age discrimination claims. While Frankhouser's reliance on direct evidence of discrimination falls short, a reasonable jury could find that Horst's proffered reasons for its actions were pretext for age discrimination.

#### A. Age Discrimination

To establish a claim of age discrimination under the ADEA and the PHRA, a plaintiff "must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009); *see also Willis v. UPMC Child.'s Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) ("[T]his Court has determined that the interpretation of the PHRA is identical to that of federal anti-discrimination laws, including the ADEA . . . ."); *Power v. Lockheed Martin Corp.*, 419 F. Supp. 3d 878, 889 (E.D. Pa. 2020). A plaintiff may meet that burden through direct or circumstantial evidence. Claims based on circumstantial evidence are evaluated under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009).

Frankhouser offers both direct and circumstantial evidence of discrimination. The Court first addresses the direct evidence and then applies the *McDonnell Douglas* framework.

1. <u>Direct Evidence</u>

Proving age discrimination by direct evidence is a "high hurdle." *Cellucci v. RBS Citizens, N.A.*, 987 F. Supp. 2d 578, 587 (E.D. Pa. 2013) (quoting *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 248 (3d Cir. 2002)). "The plaintiff's evidence must lead[] not only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it when he made the challenged employment decision." *Power*, 419 F. Supp. 3d at 889 (internal quotation marks and citation omitted). "Stray remarks . . . by decisionmakers unrelated to the decision process are rarely given great weight." *Id.* at 889–90 (quoting *Cellucci*, 987 F. Supp. 2d at 588).

Frankhouser argues that the SWOT Report—specifically, its description of Frankhouser as "retired in place"—is direct evidence of age discrimination. (*See* Pl.'s Resp. Mem. 14–15, ECF No. 39.) He analogizes the language to the direct evidence presented in *Fakete v. Aetna, Inc.*, 308 F.3d 335 (2002). There, a supervisor's statement that "he was 'looking for younger single people' and that, as a consequence, [plaintiff] 'wouldn't be happy [at Aetna] in the future'" was sufficient evidence to survive summary judgment. *Id.* at 339.

But unlike the comment in *Fakete*, the language in the SWOT Report does not "unambiguously" convey that an employee is "less desirable . . . because of his age." *Id.* at 339–40. Indeed, "use of the word 'retired' does not 'require[] the conclusion' that [Horst] harbored age-based animus." *Lewis v. City of Detroit*, 702 F. App'x 274, 280 (6th Cir. 2017) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003)) (holding that characterization of plaintiffs as "retired in place" is not direct evidence of age discrimination); *cf. Gutknecht v. SmithKline Beecham Clinical Lab'ys, Inc.*, 950 F. Supp. 667, 670 (E.D. Pa. 1996)

9

(recognizing that a comment that "does not relate to age on its face . . . shows no age animus"). And no other evidence suggests that "'retired in place' was a term used to denote age." *Lewis*, 702 F. App'x at 280. Witnesses instead linked the language to Frankhouser's allegedly substandard performance. (*See* Appx. 111 ("[T]o me it symbolizes a disengagement from one's business responsibilities."), 155 ("I understood that to mean . . . that [Frankhouser] wasn't doing anything to – he wasn't looking at newest technology."), 165 ("[T]o me, that's somebody that shows up and does the bare minimum and collects a paycheck.").) Frankhouser himself even described the language as performance related.[3] (*See* Appx. 67 ("[I]t really reflected on how I was performing, I guess.").)

In sum, then, the language in the SWOT Report is not direct evidence of age discrimination. When viewed in the context of Frankhouser's remaining circumstantial evidence (*see infra* Section III.A.2), the SWOT Report perhaps "suggest[s] an age-based bias," but it does not "directly show[] the necessary discrimination without inference or presumption, and thus . . . do[es] not meet the rigorous direct evidence requirement." *Cellucci*, 987 F. Supp. 2d at 588 (internal quotation marks and citation omitted).

    2.    <u>Circumstantial Evidence</u>

"Where, as here, there is no direct evidence of discrimination, the plaintiff must establish his claims pursuant to the burden-shifting framework outlined in *McDonnell Douglas*." *Power*, 419 F. Supp. 3d at 890. That framework consists of three steps. First, the plaintiff must establish a prima facie case of age discrimination. *See Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004). If the plaintiff establishes a prima facie case, "the burden of production shifts

---

[3] Frankhouser also could not point to any other pieces of direct evidence. (*See* Appx. 39 ("I would say I don't have anything that specifically refers to my age.").)

10

to the defendant to show that there was a nondiscriminatory reason for the adverse employment decision." *Id.* (internal quotation marks and citation omitted). Finally, if the defendant sets forth a nondiscriminatory basis for its decision, "the burden of production shifts once again to the employee to establish that the employer's proffered justification for the adverse action is pretextual." *Smith*, 589 F.3d at 691 (citation omitted). "At all times, however, the burden of persuasion rests with the plaintiff." *Id.* at 690 (citation omitted).

      a.     *Prima Facie Case*

"In order to establish a prima facie case of discrimination, the plaintiff must demonstrate that (1) s/he is over forty, (2) is qualified for the position in question, (3) suffered from an adverse employment decision, and (4) that his or her replacement was sufficiently younger to permit a reasonable inference of age discrimination." *Potence*, 357 F.3d at 370 (citing *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 167 (3d Cir. 2001)); *cf. Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006) ("[T]here is a low bar for establishing a *prima facie* case of employment discrimination." (citation omitted)). Horst does not dispute that Frankhouser has satisfied the first three elements. Instead, Horst challenges the final element of Frankhouser's prima facie case. According to Horst, Frankhouser's claim is "based on pure unsupported speculation."[4] (Def.'s Br. 7, ECF No. 34.)

---

[4] Horst alternatively argues that Frankhouser "has not and cannot establish that a younger individual was *treated more favorably* under circumstances supporting an inference of discriminatory intent." (Def.'s Br. 7, ECF No. 34 (emphasis added).) But the Court's focus, at least at the prima facie stage, is on whether Frankhouser's replacement "was sufficiently younger to permit a reasonable inference of age discrimination"—not whether that replacement was treated more favorably. *Potence*, 357 F.3d at 370 (citing *Duffy*, 265 F.3d at 167)). To be sure, a plaintiff need not be directly replaced in order to bring an age discrimination claim. *See Willis*, 808 F.3d at 644 ("Where the plaintiff is not directly replaced, the fourth element [of the prima facie case] is satisfied if the plaintiff can provide facts which if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." (internal quotation marks and citation

11

"[S]peculation is an insufficient substitute for evidence from which a reasonable juror could infer discriminatory intent." *Fairclough v. Wawa, Inc.*, 412 F. App'x 465, 470 (3d Cir. 2010). So Frankhouser's belief that he was terminated because of his age (*see* Appx. 40) "does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990) (citation omitted).

That said, it is undisputed that Ebelhar replaced Frankhouser. (*See* DSOF ¶ 109.) And a reasonable jury could find, based on the evidence in the record (*see* P.A. 270), that Ebelhar is at least 29 years younger than Frankhouser.⁵ Because this age gap "is sufficient to permit an inference of discrimination," Frankhouser has established his prima facie case. *Cassidy v. Halyard Health, Inc.*, 391 F. Supp. 3d 474, 483 (E.D. Pa. 2019); *see also Barber v. CSX Distrib. Servs.*, 68

---

omitted)). But this is not such a case—here, it is undisputed that Ebelhar directly replaced Frankhouser. (*See* DSOF ¶ 109.)

⁵ Horst argues that the "evidence produced during discovery . . . does not include actual evidence of Mr. Ebelhar's age." (Def.'s Reply 5.) Perhaps recognizing this shortcoming, Frankhouser attaches a state court docket sheet to its opposition briefing. (*See* P.A. 270–71.) While that docket sheet shows the year of birth for "Dustin A. Ebelhar" (*id.*), "it is not indisputably clear within the four corners of the document that it relates to the Mr. Ebelhar that *actually replaced* [Frankhouser]." (Def.'s Reply 6 (emphasis added).)

Quite frankly, it is bizarre that "neither party has disclosed the age of [Frankhouser's] actual replacement, particularly where [Ebelhar] . . . is a [Horst] employee and information such as [his] date of birth would presumably be available to, and known by, [Horst]." *Matylewicz v. Cnty. of Lackawanna Transit Sys. Auth.*, No. 3:19-cv-1169, 2021 WL 4391213, at *2 n.2 (M.D. Pa. Sept. 24, 2021) (internal quotation marks and citation omitted). But when viewing the docket sheet alongside other evidence in the record—namely, a copy of Ebelhar's LinkedIn profile (*see* P.A. 268–69)—the Court is satisfied that Frankhouser has established the fourth prong of his prima facie case. Indeed, both the LinkedIn profile and the docket sheet refer to a Dustin Ebelhar located in Ephrata, Pennsylvania. (*Compare* P.A. 268, *with* P.A. 270.) Taken together, this evidence, though modest, permits a finding that Frankhouser was replaced by an employee "sufficiently younger" than him. Stated differently, the Court cannot conclude, as a matter of law, that Frankhouser has failed to carry his prima facie burden under *McDonnell Douglas*. *Cf. Matylewicz*, 2021 WL 4391213, at *2 (a prima facie case of age discrimination "does not require that the precise age difference between the plaintiff and [his] replacement be known").

F.3d 694, 699 (3d Cir. 1995) (holding that an eight-year age gap "could support a finding that [a replacement] was 'sufficiently younger' than [plaintiff] to permit an inference of age discrimination").

### b. *Legitimate Nondiscriminatory Reasons for Termination*

Frankhouser has established a prima facie case of age discrimination, so the burden now shifts to Horst to produce "sufficient evidence to support a nondiscriminatory explanation for its decision." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). This "relatively light" burden is met by introducing evidence "which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (citations omitted).

Horst asserts that Frankhouser was terminated because of his "history of clear, objective performance issues resulting in significant IT system issues and security threats." (Def.'s Br. 15.) And Horst has offered evidence that, taken as true, would permit a finding that it terminated Frankhouser "based not on his age but on his continued, inadequate performance." *Cridland v. Kmart Corp.*, 929 F. Supp. 2d 377, 387 (E.D. Pa. 2013); *see also Edgerton v. Wilkes-Barre Home Care Servs., LLC*, 600 F. App'x 856, 858 (3d Cir. 2015) (employer carried its burden by introducing evidence of plaintiff's "poor performance and lack of leadership"); *DeCicco v. Mid-Atl. Healthcare, LLC*, 275 F. Supp. 3d 546, 555 (E.D. Pa. 2017) ("Courts within this district have routinely accepted evidence of a plaintiff's failure to meet expected performance goals, in addition to poor work performance, as facially legitimate, non-discriminatory reasons for adverse employment decisions." (citations omitted)). Accordingly, Horst has met its burden under the *McDonnell Douglas* framework.

      c.     *Pretext*

Horst has advanced legitimate, nondiscriminatory reasons for its actions, so the burden shifts back to Frankhouser "to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual." *Willis*, 808 F.3d at 644 (citing *Burton*, 707 F.3d at 426–27). To show pretext, a plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Burton*, 707 F.3d at 427 (citing *Fuentes v. Peskie*, 32 F.3d 759, 764 (3d Cir. 1994)); *see also McErlain v. SPS Techs.*, No. 17-3034, 2019 WL 356541, at *11 (E.D. Pa. Jan. 29, 2019) ("The plaintiff can prove pretext by submitting evidence that either casts doubt on the employer's justification or shows that discrimination was more likely than not a 'but for' cause of the employment action." (citation omitted)).

"In order to raise sufficient disbelief, the evidence must indicate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons." *Willis*, 808 F.3d at 644–45 (quoting *Fuentes*, 32 F.3d at 765). In other words, a plaintiff "may satisfy this standard by demonstrating, through admissible evidence, that the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *DeCicco*, 275 F. Supp. 3d at 557 (quoting *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999)).

While a close call, Frankhouser has mustered sufficient evidence that could cause a reasonable jury to disbelieve Horst's nondiscriminatory reasons for its actions. First and foremost,

"[w]hen a plaintiff shows that the reasons given for termination were not consistent throughout the proceedings, 'this may be viewed as evidence tending to show pretext.'" *Gilson v. City of Phila.*, No. 20-758, 2021 U.S. Dist. LEXIS 212950, at *10 (E.D. Pa. Oct. 26, 2021) (quoting *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 284 (3d Cir. 2001)); *see, e.g.*, *Cullen v. Select Med. Corp.*, 779 F. App'x 929, 932 (3d Cir. 2019) (reversing entry of summary judgment where defendant "offered inconsistent explanations of why it fired" plaintiff). Horst says that it fired Frankhouser because of his "history of clear, objective performance issues." (Def.'s Br. 15.) But, at least according to Frankhouser, that is not what Giordano said at their final meeting. (*See* P.A. 28; Appx. 231–32.) Geist, who was present at that meeting, corroborated Frankhouser's account and testified that Frankhouser "wasn't let go for performance issues." (P.A. 98.)

There is also a genuine dispute as to whether Horst's reliance on the Weidenhammer report and Arraya Reports was "a *post hoc* justification that did not actually motivate the termination." *Gilson*, 2021 U.S. Dist. LEXIS 212950, at *17 (citing *Fuentes*, 32 F.3d at 764). For one thing, Giordano—the ultimate decisionmaker concerning Frankhouser's employment—never even received a copy of the Weidenhammer report. (Appx. 87; DSOF ¶ 47.) And, in November 2018— two months *before* Arraya issued its final report that identified "cyber security vulnerabilities" in Horst's network (Appx. 284)—Giordano instructed Geist "to pull together a severance letter for [Frankhouser]." (P.A. 88.) All the while, "there were discussions concerning the potential termination of [Frankhouser's] employment" (DSOF ¶ 134), including the creation of a timeline for Frankhouser's termination that was drafted well before Arraya submitted its final reports. (P.A. 208.) Horst claims that the decision to terminate Frankhouser was not made "until after the Arraya Reports confirmed the numerous significant IT issues and serious security threats that occurred while [Frankhouser] was the IT manager" (DSOF ¶ 134); however, Horst had already set the

15

wheels of Frankhouser's termination in motion. Accordingly, Frankhouser has adduced "evidence from which a factfinder could reasonably disbelieve [Horst's] proffered reasons," and the Motion for Summary Judgment is denied.[6] *Binkley v. Kreider*, No. 5:14-cv-6973, 2016 WL 852039, at *7 (E.D. Pa. Mar. 4, 2016).

## IV.    CONCLUSION

For the foregoing reasons, Horst's Motion for Summary Judgment is denied. An appropriate order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge

---

[6]    Having found that Frankhouser met his burden under the first *Fuentes* prong, this Court need not consider his arguments under the second prong. *See, e.g.*, *DeCecco v. UPMC*, 3 F. Supp. 3d 337, 386 (W.D. Pa. 2014).